### EDSON ELY v. SOPHIA OTT.

1. EVIDENCE OF MERE OPPORTUNITIES TO HAVE SEXUAL INTERCOURSE IS INADMISSIBLE.

In a bastardy proceeding testimony offered in behalf of defendant to show that at times from six months to a year prior to the time the prosecutrix conceived the bastard child she associated with a man other than defendant under circumstances and in situations that afforded them opportunities to have sexual intercourse unaccompanied by an offer to prove that they had shown a disposition to have sexual intercourse, was properly excluded: *First*, because of the remoteness of the time. *Second*, because evidence of mere opportunities without evidence of disposition also to commit such acts was immaterial.

2. AUTHORITY OF REVIEWING COURT TO DISTURB THE JUDGMENT OF THE TRIAL COURT.

A reviewing court is not authorized to disturb the judgment of the trial on the ground that the judgment required to be paid by the reputed father for the maintenance of the bastard child is excessive, unless it shall appear that there has been an abuse of the discretion vested in said trial court, and in this case the court refuses to disturb a judgment of $1,300.

ERROR to the Court of Common Pleas of Lucas county.

PARKER, J. (Orally.)

On the 31st day of December, 1892, Sophia Ott filed an affidavit before a justice of the peace of this county, charging the plaintiff in error, Edson A. Ely, with being the father of her then unborn bastard child. He was arrested upon the charge, an examination was had, he was bound over to the court of common pleas, and it appears that the case was twice tried in that court, and the jury each time disagreed; and the third time it came on for trial in November, 1896, and the result of that trial was a verdict of guilty returned against the plaintiff in error. Upon this the judge of the court adjudged that the plaintiff in error was the father of the bastard child, which was then alive, and about four years old, and required and adjudged that the plaintiff in error should pay for its support and maintenance the sum of $1,300, requiring him to enter into bond, as provided by the statute, for the performance of that obligation. The plaintiff in error made a motion for a new trial, which was overruled. Thereupon he filed his petition in error in this court to reverse that judgment and have that verdict set aside. The grounds relied upon here, are, that the court erred in excluding certain evidence offered on behalf of the plaintiff in error; second, that the verdict is against the weight of the evidence; and third, that the amount which the plaintiff in error was adjudged to pay for the support of this bastard child was excessive.

Coming to a consideration of the first point stated, it appears upon page 148 of the bill of exceptions that during the progress of the cross-examination by counsel for defendant in error of one of the witnesses for plaintiff in error, after he had entered upon his defense below, questions

were asked with a view of ascertaining the relations of the relator, Sophia Ott, with her brother-in-law, Green; it being claimed, and counsel for the plaintiff in error stating, that their relations had been unduly intimate. They attempted to show this evidently for the purpose of discrediting the witness, Sophia Ott, and for the purpose, of throwing doubt upon her statement as to the paternity of this bastard child. The examination, appearing at page 148 of the bill of exceptions, runs as follows:

"Q. Do you know where Freedom Green and his wife lived in 1890 and 1891? A. I am not sure, but I think they lived up to Palmyra.

"Q. At the time that you saw them starting off together, in a buggy or wagon, was when they started to Palmyra, was it? A. Yes; that is where they said they were going.

"Q. You knew that they lived there at that time? A. I supp sed they did.

"Q. Isn't it a fact that you and all the neighbors there knew right where they lived? A. I heard that they lived there; we supposed that they did. I never heard that they lived anywhere else.

"Q. At the time you said they went back there to the woods together, and passed your house, that was the same day that they started to Palmyra, wasn't it—later in the day? A. I don't know whether they went to Palmyra that night or not.

"Q. It was when they lived at Palmyra? A. Yes."

Mr. Hamilton, who appeared as counsel for the relator, asked, "I ask to have the Palmyra business, and the going back into the woods, excluded."

The Court: "The jury will not consider that, or anything that transpired in 1891."

It was charged on behalf of the relator, and it was attempted to be shown, that the illicit intercourse between the relator and defendant which resulted in the conception of this bastard child, occurred in July, 1892. There is some little difference about the date in July in the testimony of the witnesses, but it was agreed on all hands that the occurrence about which they testified when this intercourse was said to have taken place, was in July, 1892. Perhaps it may be said that it certainly occurred upon the 8th day of July, 1892. Counsel for the defendant below excepted to the exclusion of said testimony. The matter again came before the court and jury, it appears, at page 175 of the bill of exceptions. It was during the examination of Josephine Ely, a witness for the plaintiff in error, while her examination was being conducted by counsel for the plaintiff in error:

"Q. How frequently, during a period, say, of six months or a year prior to this suit—prior to the 8th day of July—had you seen Sophia and Freed. Green around together?" (Objected to.)

The Court: "I think the time is too long—within six months or a year would be too remote."

It seems that there was some mistake upon the part of the counsel for the plaintiff in the framing of that question, or that there is some misapprehension of what the question really was, the way it reads: "How frequently, during a period, say, of six months or a year prior to

the 8th day of July—had you seen Sophia and Freed. around together?" But we discuss it and pass upon it as it seemed to have been understood by all the parties, as a question asked with reference to the d te when this occurrence which resulted in the conception of this ch ld to k place. The court says, "I think the time is too long—within six months or a year would be too remote."

"Q. During that same period, what had you seen them doing together?" (Objected to; sustained; defendant excepted.)

Mr. Southard: "By these questions I expect the answer would be that—"

Mr. Hamilton: "I think you had better put it down on paper."

Mr. Southard: "I will do that." (Said offer to prove was then reduced to writing and submitted to opposite counsel and the court, and was as follows: "To these questions I expect to show that they were frequently together, out riding and otherwise, and that they were at times in the fields and woods together."

The Court: "As an answer to the question as put, I will exclude it."

It will be observed that the question related to that same period, to-wit: from a period of six months or a year prior to the 8th day of July, 1892, and that was the reason that the court gave for excluding it, that it was too remote.

It is urged on the part of the plaintiff in error that the court erred in this respect, in thus denying them the privilege of showing—an opportunity of showing—that these persons had been frequently together, out riding and otherwise, and they were out in the fields and woods together. It is said that it is competent for the plaintiff in error to show as a part of his defense a disposition upon the part of the relator to have illicit sexual intercourse with other persons than the defendant and an opportunity to satisfy her desire, and that testimony of the character which they offered to produce would tend to show such disposition and opportunity. The evidence would be of no value, even if it tended to prove this, unless it was so followed up with other evidence tending to show disposition and opportunity at about the time when this girl came to be in the family way. To show opportunities at a time so remote we think was not allowable, and we hold that the court was not wrong in excluding this kind of testimony. And we think the offer did not go to anything that would tend to show disposition. The mere fact that they may have had opportunities to have illicit intercourse would not tend at all, to show disposition. The fact that they had been together under circumstances that would afford such opportunities, standing alone as the offer to prove was made, would not tend to show disposition. And therefore we are of the opinion that the court did not err in thus rejecting it. What the view of this court would have been had the offer to prove gone so far as to show definitely not only opportunities but a disposition, we need not say.

It is urged that the verdict of the jury is against the weight of the evidence. We have read the bill of exceptions very carefully, and some of the testimony more than once, and have discussed it; and I may say that it has given us a great deal of trouble. We feel bound to follow certain rules upon the subject of interfering with the verdict of a jury

which are well known to the profession, and which are very well stated in the case of *Dean, et al.* v. *King & Co.*, 22 O. S., 118, 134.

"The verdict of a jury should not be set aside by the court to which it is returned on account of any mere difference of opinion between the judge and the jury as to the weight of the testimony, but only when the verdict is unsupported by or is against the dec ded weight of the eviden.e.

"Motions for new trials, upon the ground that the verdict is against the weight of the evidence, are addressed to the d scretion of the court, and if granted, the judgment will not be disturbed on error unless the case is so strong as to show an abuse of the discret on. And if the motion be overruled, a reviewing court should not reverse, unless the verdict (or finding of fact, if the jury be waived) is so clearly unsupported by the weight of evidence as to indicate some misapprehension, or mistake, or bias on the part of the jury, or a willful disregard of duty."

A mere difference of opinion, it will be seen, upon the part of the trial judge or upon the part of this court, would not justify a disturbance of the verdict. In order to authorize it, we must be fully persuaded that the verdict is manifestly and clearly against the weight of the evidence. It will be profitless in this case to enter into a discussion of this testimony. The testimony of something like fifteen or sixteen w tne ses, covering about 225 pages of a closely written bill of exceptions is in the record. We shall not attempt it. I will say briefly, that the occasion when this act of sexual intercourse was said to have taken place on the 8th day of July, 1892, was when the families of the defendant and the relator were together in front of their residences, and in and about their residences, which were situated on opposite sides of a public street or highway. There were some nine or ten persons, or perhaps twelve, present in the course of the evening at this time and place. It is said by the relator that while the children of the two families were playing together, and some older persons were present, she and the defendant's little sister went into the defendant's house to get a drink of water in the kitchen; that after the defendant's sister had obtained a drink of water she went out of the room, and the relator was taking a drink of water, when the defendant came in and took hold of her, threw her down upon the floor, and ravished her.

She and the witnesses on her behalf say this time referred to was late in the evening—after dark. There are about a half a dozen of those witnesses all testifying to that state of facts which would bring this occurrence after dark On the other hand, an equal number of witnesses on behalf of the plaintiff in error testified that they had all separated, and all this visiting and playing around the yard was over before darkness had set in; and if that is correct, this act must have taken place in broad daylight, and therefore it is said the story of the relator is entirely improbable and unbelievable. After discussing this evidence, we are of the opinion that after all the case rests upon the positive assertion of the relator that the defendant did as she testifies, and the equally positive denials of the defendant, with very little aid and support from the other testimony. Nothing really reliable can be derived from the testimony of these children and others who were in and about there, and whose attention was not brought to the occurrences of this particular evening,

so that they would be called upon to think about it or reflect upon it, or refresh their minds upon it until at least s'x months afterwards. There are some things stated by the relator whi h are improbable. For instance, that under these circumstances the interc.urse was entirely against her will or consent; that it was forcibly accomplished by the defendant. And we think her statement equally improbable that this intercourse never occurred except upon th's one occasion. We know as a matter of common experience, that when these things come to be tried, while a plaintiff may be prevailed upon to tell the exact truth with reference to all the other parts of the occurrence, she cannot be prevailed up  n to tell the truth or to admit the fact that the intercourse was with her free will and consent, and that it had repeatedly occurred, as is usually the case. The defendant appears to have testified in a very straightforward manner as to the occurrences of that evening; but not having had an opportunity to see the witnesses, and to observe their demeanor, appearance, etc., we are not prepared to say that the verdict is so manifestly against the weight of the evidence as that we would be authorized to disturb it. We have considered this evidence without reference to the fact that the bastard child was present at this last trial, and was exhibited to the jury. We have considered it as if the verdict must be supported by the evidence as it appears in the bill of exceptions and have come to our conclusion after giving that alone consideration. It appears, however, that upon the trial of the case the child was exhibited to the jury, and by a decision of our Supreme Court in the case of *Crow* v. *Jordon*, 48 O. S., 655, it is not error to do that. Not only is that true, but the jury have a right to see the child and consider its appearance as bearing upon the question of its paternity. As said by the court:

"The circuit court did not err; and there was no error in permitting the child to be exhibited to the jury as evidence of alleged paternity, and in corroboration of the testimony of the prosecutrix."

So the jury had in addition to this which is exhibited to us in cold type, an opportunity to see the witnesses, observe their manner, and besides that, an opportunity to observe the resemblance, actual or fancied, between the child and its reputed father.

It is contended that an excessive amount was fixed to be paid by the defendant for the support of the child. The statute upon the subject, sec. 5626, is as follows:

"If the accused, in person or by counsel, confess in court that the accusation is true, or if, upon the trial, the jury find him guilty, he shall be adjudged the reputed father of the bastard child, and shall stand charged with the maintenance thereof in such sum as the court shall order and direct, with payment of costs of prosecution."

And the court is also "to require bond in such sum as it shall direct." So that such authority as we have to consider the verdicts of juries, upon the question of their being excessive, does not appear to be applicable to this provision of the law. We find some authority upon the subject which seems to deny our right to interfere in a case like this —*Clark* v. *Carey*, 41 Neb., 780:

"Some discretion is allowed the trial court in fixing the amount in which the accused, upon conviction for bastardy, shall stand charged,

and a judgment in such case will not on appeal be held to be excessive in the absence of a manifest abuse of discretion.''

At the time this action was tried the child was about four years old. There is testimony tending to show that it had been weakly, and that it had required unusual attention; that there had been doctor bills, and nursing and attention required that would not have been required for a healthy child; and testimony tending to show that the defendant was amply able to pay the amount which he was adjudged to pay by the court. The court ordered him to pay $1,300. It is according to our experience and observation, an unusually large amount; and yet we cannot say that, under the circumstances, there was an abuse of discretion. The order was for the payment of $250 down, $250 in one year, $150 in two years, $100 in three years, and then $100 a year until the balance was entirely paid. If the child should die in the meantime before these sums came due, it would not require these for its support, and (giving my own opinion on the subject, without discussing the matter with the other members of the court) the defendant might be relieved from the payment of the amounts not then due. But considering all the expense that had been incurred, and what would probably be required for the support and maintenance of that child, we are not prepared to say that $150 per year a part of the time, and $100 a year for the remainder of the time during the infancy of the child, and during the years when it would be unable to support itself, would be too large an amount to provide for its support. At least, we can not say that there was such manifest abuse of discretion as would justify us in interfering.

I will say that we affirm this judgment with a very great deal of reluctance. We have very serious doubts as to the correctness of the conclusion of the jury, but under the rules that I have referred to, we feel bound to enter a judgment of affirmance.

*Beard & Beard, J. K. Hamilton,* for Defendant in Error.

*J. H. Southard,* for Plaintiff in Error.